**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

ELIZABETH WAKEFIELD,

        Plaintiff,

   v.

INSULET CORPORATION, et al.,

        Defendants.

Civil Action No. 1:26-cv-10971-WGY

**LEAVE TO FILE GRANTED ON
JUNE 15, 2026 [ECF 28]**

**REPLY IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT**

**I.    INTRODUCTION**

Plaintiff's Opposition ("Opposition") to Defendants' Motion to Dismiss ("Motion") concedes that her Complaint has only alleged underperformance returns of 0.36% to 2.95% at highest by the AC TDFs against the Comparator TDFs.[1] Plaintiff also does not deny that courts across the country have dismissed ERISA fiduciary duty breach claims with similarly modest and weak underperformance allegations. Instead, Plaintiff argues there is no "floor" for underperformance allegations, but that is beside the point: there is unquestionably a long line of well-reasoned decisions that did not allow underperformance allegations of ***the level alleged here*** to proceed to discovery and, instead, applied the context-specific analysis of a complaint's allegations required by the Supreme Court in *Twombly*, *Iqbal*, *Dudenhoeffer*, and *Hughes* to correctly determine that such allegations do not plausibly establish imprudence and dismiss them.[2]

To avoid this irrefutable fact, Plaintiff dresses up the Complaint with other metrics to mask the inadequate return numbers pled in the Complaint. But courts have held these same metrics do

---

[1] All defined terms have the same meaning as set forth in the Memorandum in Support of Defendants' Motion to Dismiss the Complaint ("Memorandum"), ECF 10.

[2] A non-exhaustive list of these decisions is cited in Defendants' Memorandum, ECF 10 at 10 – 13.

not save insufficient allegations regarding performance returns. And, more importantly, Defendants highlighted that these metrics simply mirror the insufficiency of the performance numbers because the differences between the AC TDFs and Comparator TDFs are minimal and in several metrics the AC TDFs did better. In addition, Plaintiff's heavy reliance on metrics that are risk adjusted and rely on different fund benchmarks underscores their failure to provide any allegations that, if true, would establish that the Comparator TDFs are meaningful comparators to the AC TDFs.

For the reasons set forth below and in Defendants' Motion, the Complaint should be dismissed.

## II.    PLAINTIFF CANNOT RECAST DEFICIENT UNDERPERFORMANCE ALLEGATIONS TO PLAUSIBLY PLEAD IMPRUDENCE

### A.    Plaintiff Has Not Alleged the Continuous, Substantial Underperformance Required to Plausibly State a Claim.

Defendants' principal argument for dismissal is the Complaint's alleged underperformance returns of 0.36% to 2.95%, from only two quarters that precede the relevant period, are the same type of allegations that courts have dismissed as insufficient to plausibly state a claim for breach of fiduciary duty. ECF 10 at 10 – 13. The Opposition fails to refute this principal argument. Plaintiff argues there is no "floor" for underperformance, but Defendants never claimed there is a "floor." Instead, Defendants have pointed out that the overwhelming majority of courts have dismissed claims with underperformance allegations of the magnitude alleged by Plaintiff – in fact, in several cases the alleged underperformance was even higher. *Id.* at 9 – 14.

Plaintiff claims there are courts who have allowed underperformance allegations of their small magnitude to proceed to discovery, but Plaintiff misrepresents these cases. ECF 26 at 17 – 18. First, Plaintiff alleges *Fezer v. Lockheed Martin Corp.*, 2026 WL 1041276, at \*6 (D. Md. Apr. 16, 2026), allowed 0.34%-1.09% underperformance allegations to survive dismissal. ECF 26 at 17

– 18. But the *Fezer* case ***does not*** hold that allegations of underperformance of 1.09% are sufficient – the opinion explicitly describes allegations of underperformance ranging from "0.19% to ***7.14%***" and "2.87% to ***7.16%.***" *Fezer*, 2026 WL 1041276, at \*2, and \*6 (emphasis added). These ranges are nearly ***triple*** the size of the underperformance allegations in Plaintiff's Complaint. *Fezer* also involved additional allegations that the TDFs at issue "were established and managed in-house, with potential financial benefits to Lockheed Martin" and that defendants "were on notice of [the defendant investment manager's] deficiencies in selecting funds based on a prior lawsuit that resulted in a $62 million settlement in 2015 and an internal review of the performance of the Plans' funds in 2019." *Id.* at \*7. No such allegations are present here, and *Fezer* actually supports Defendants' position that allegations of substantial underperformance are required to infer imprudence.

The same is true for *Payne v. Hormel Foods Corp.*, 2024 WL 4228613 (D. Minn. Sept. 18, 2024). Plaintiff argues that 0.71% was the high range of alleged underperformance in that case (ECF 26 at 17 – 18), but the opinion clearly describes the alleged underperformance to be as high as 4.00%. *Payne*, 2024 WL 4228613, at \*2 ("The TIAA-CREF annuity crediting rate exceeded the crediting rate for the Plans' GIC in every calendar quarter over the relevant period, by a rate of 1.25% to 4.00%."). In addition, the *Payne* plaintiffs provided data to allege that this underperformance occurred for "every calendar quarter over the relevant period"; whereas Plaintiff provides data showing smaller underperformance for only ***two*** calendar quarters that occurred ***prior to*** the relevant period. Thus, *Payne* does not support Plaintiff's argument.

Plaintiff similarly misrepresents the holding in *Trauernicht v. Genworth Financial Inc.* Plaintiff argues this case confirmed that an alleged "multi-million dollar loss" is sufficient to plausibly state a claim. ECF 26 at 18. Not so. The *Genworth* plaintiffs provided data in their

complaint *for every calendar quarter* from Q3 2016 to Q3 2019 (12 quarters over three years). ECF 103, Case No. 3:22-cv-00532, at 25 – 35, ¶¶ 52 – 54. They also provided charts showing further quarterly data comparisons ranging from Q2 2016 – Q2 2022 (24 quarters over six years). *Id.* at 37 – 46, ¶¶ 56 – 60. In addition, the *Genworth* plaintiffs alleged cumulative underperformance over this period ranging from 1.93% to *9.01%*. *Id.* at 38, ¶ 57. Also, the loss alleged in *Genworth* was "over $100 million" – not just a "muti-million dollar loss" as Plaintiff alleges. *Genworth*, 2023 WL 5961651, at *2. In other words, *Genworth* is entirely consistent with Defendants' argument that plaintiffs are required to allege *continuous* and *substantial* underperformance in order to plausibly allege a claim. ECF 10 at 9 –14.[3]

Faced with little authority in support of their argument, Plaintiff tries to distinguish Defendants' citation to *Lalonde v. Massachusetts Mut. Ins. Co.*, 728 F. Supp. 3d 141 (D. Mass. 2024). First, Plaintiff claims *Lalonde* only "calls 0.3%-2.5% spreads 'modest'." ECF 26 at 18. But that is just one set of performance returns that *Lalonde* evaluated – the *Lalonde* complaint alleged underperformance over a five-year period between 0.08% and 2.5% against benchmarks. *See* ECF 1, Case No. 3:22-cv-30147-MGM (D. Mass), at 21. However, the *Lalonde* plaintiffs also alleged higher underperformance against alleged comparator *funds* (the only type of comparison Plaintiff provides here): 1) over a three-year period, *6.75%*, *8.33%*, and *8.76%*; 2) over a five-year period, *3.39%*, *4.63%*, and *4.78%*; and 3) over a ten-year period, *3.24%*, *3.47%*, and *5.13%*. *Id.* at 22. All

---

[3] Plaintiff is left with one only case to support their argument that they have sufficiently alleged underperformance, *Carter v. Sentera Healthcare Fiduciary Comm. Carter* is unpersuasive – it goes against the holdings of virtually every opinion for similar claims in this country, and fails to explain how it reached that decision. 2025 WL 2427614, at *5 (stating "the Court will not take a position on whether 1.36% is enough underperformance to sustain the plaintiffs' claim at this juncture," but then immediately stating "the Court reasonably infers that 1.36% is sufficient underperformance.").

these allegations were before the *Lalonde* court when the complaint was dismissed, and each amount is higher than Plaintiff's top-end underperformance number of 2.95%.[4]

Analyzing these allegations, *Lalonde* held these "modest differentials in performance" (like Plaintiff's allegations here) cannot survive a motion to dismiss because "the underperformance must be substantial for a court to plausibly infer the challenged funds retention was imprudent." 728 F. Supp. 3d at 155-56. This is because, absent allegations of substantial underperformance, such comparisons merely "reflect[] the inherent vagaries of investing in the market," which is not enough to plausibly allege imprudence. *Id.* (citing *Gonzalez v. Northwell Health, Inc.*, 2024 WL 6935277, at *4 (E.D.N.Y. Mar. 26, 2024) (dismissing complaint with 0.43% to 2.99% alleged underperformance), and *Cho v. Prudential Ins. Co. of Am.*, 2021 WL 4438186, at *9 (D.N.J. Sept. 21, 2021) (dismissing complaint with .07% to 3.71% of alleged underperformance)). Thus, *Lalonde* supports dismissal of Plaintiff's claims here, which allege underperformance returns of 0.36% at its lowest to 2.95% at its highest (the latter number lower than each of the high ranges at issue in *Lalonde*, *Gonzalez* and *Cho*).[5]

In sum, the Complaint does not allege the consistent and substantial underperformance required to plausibly state a claim and should be dismissed.

---

[4] Plaintiff also attempts to distinguish *Lalonde* because it involved a stable value fund and not a TDF (so does *Payne*, a case Plaintiff cites for support as discussed above). But Plaintiff does not point to any authority that holds ERISA prudence standards are different for a stable value fund than for a TDF. In fact, the Supreme Court has espoused the opposite view, stating in *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 418-19 (2014), that "the same standard of prudence applies to all ERISA fiduciaries," subject to ERISA's diversification carveout for employee stock ownership plans not at issue here.

[5] Also infirm is Plaintiff's contention that *Lalonde* is inapplicable because it only considered two "comparators." But Plaintiff's use of "comparator" to mean *metrics* is a different definition than the term used in the *Lalonde* complaint, which compared five different funds against 14 other funds (the "comparators"). *See* ECF 1, Case No. 3:22-cv-30147-MGM (D. Mass), at 22.

### B.       Plaintiff's Additional Metrics do not Plausibly Allege Imprudence.

Plaintiff attempts to distinguish Defendants' cited authority by claiming other courts did not evaluate allegations consisting of the various other metrics cited in the Complaint. ECF 26 at 1 – 2, 19. Specifically, Plaintiff claims their allegations are not just based on returns, but on an alleged "98% miss rate" for their "MPT metrics." *Id.* at p. 1. But other courts, including a court addressing claims against the same AC TDFs, have held such metrics do not transform otherwise infirm return allegations into plausible claims of imprudence.[6] *See, e.g., Phillips v. Cobham Advanced Elec. Sols., Inc.*, 2024 WL 3228097, at *8 (N.D. Cal. Jun. 28, 2024) (stating such metrics "are mere restatements of the proposition that underperformance is a sufficient basis to find a breach of the duty of prudence" and dismissing a complaint attacking the AC TDFs); *Hall v. Cap. One Fin. Corp.*, 2023 WL 2333304, at *6 (E.D. Va. Mar. 1, 2023) ("The addition of the Sharpe ratio . . . [is] merely [an] additional measurement[] of investment performance. That the Sharpe ratio is alleged to analyze performance on a risk-adjusted basis is therefore immaterial."); *Beldock v. Microsoft Corp.*, 2023 WL 3058016, at *3 (W.D. Wash. Apr. 24, 2023) (same, quoting *Hall*).

Plaintiff criticizes Defendants' reliance on *Hall*, *Beldock,* and *Tullgren v. Hamilton*, 2023 WL 2307615 (E.D. Va. Mar. 1, 2023), because those cases only involved one of their metrics, but

---

[6] There is imminent logic behind the *Phillips* holding. Plaintiff harps on the "98% miss rate" for their various MPT metrics, but throughout the Complaint never alleges facts that show what that miss rate, or the miss rate of any individual metric, translates to in terms of relative performance. If it is true that the AC TDFs "failed" on 662 out of 674 data points as Plaintiff alleges, and those metrics were an accurate predictor of performance, one would presumably expect the funds' performance to be abysmal. However, it clearly was not, because the funds' three-year performance was within 2% of all Plaintiff's Comparator TDFs (which Plaintiff trumpets as the "industry leaders" in the market) in 46 out of 55 measuring periods, and five-year performance was within 2% for 48 out of 50 measuring periods. ECF 10 at 5-6. Accordingly, the facts show that Plaintiffs' MPT metrics, however they relate to fund performance (which is not pled), are not a proxy for the consistent and substantial underperformance required to be alleged to make out a plausible claim of breach of prudence. As Plaintiff herself acknowledges, "ERISA's test" is all about "whether [AC managers] performed." ECF 26 at  6.

6

what those cases confirm – as does *Phillips* – is that it does not matter how many metrics Plaintiff throws onto the pile when the threshold underperformance allegations are deficient. *See, e.g.*, *Nolan v. Sonic Automotive, Inc.*, 2026 WL 1195596, at \*6 (M.D.N.C. May 1, 2026) (dismissing complaint alleging underperformance up to 7.03% and, with respect to allegations concerning the challenged fund's information ratio, holding "selective reliance on a single performance metric is insufficient to suggest imprudence.").[7]

In addition, even if the Court considers these metrics, they suffer from the same flaw as Plaintiff's allegations regarding the AC TDFs' returns. ECF 10 at 18 – 20. Namely, as demonstrated at length in Defendants' Memorandum, Plaintiff's allegations only show minor differences between the metrics for the AC TDFs and Plaintiff's "comparator" funds, and, for some of these metrics, the AC TDFs did better than the "comparator" funds. *Id.* at 18 – 19.[8] Accordingly, these metrics simply mirror the insufficient performance allegations. In other words, they fail to allege continuous and substantial underperformance that is required to plausibly state a claim. *See Lalonde*, 728 F. Supp. 3d at 155-56 (holding alleged "underperformance must be substantial for a court to plausibly infer the challenged funds retention was imprudent") (internal citations omitted);

---

[7] Plaintiff's argument that *Daggett* allowed a similar claim to survive dismissal based on "Sharpe ratio, alpha, and batting average" (ECF 26 at 7) misrepresents that opinion. The language quoted by Plaintiff in the Opposition is the *Daggett* court simply summarizing some of the allegations at issue in that complaint. *Daggett*, 731 F. Supp. 3d at 140-41. As described below, the *Daggett* opinion does not rely on the Sharpe ratio or other metrics Plaintiff cites. *See Daggett*, 731 F. Supp. 3d at 139-40 (summarizing alleged publicly reported strategy shifts and increasing risk in challenged fund).

[8] Plaintiff misrepresents another opinion by suggesting that *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015 (9th Cir. 2025), supports their reliance on these so-called "MPT metrics." ECF 26 at 7. **Modern portfolio theory**, as described by the *Anderson* court, is simply an investment theory that "recognizes that while the individual riskiness of a particular investment cannot be eliminated, it can be managed through the diversification of investment assets." *Id.* at 1024. The *Anderson* court does not mention any of Plaintiff's "MPT metrics" or endorse those metrics as sufficient to infer imprudence in ERISA fiduciary duty claims. *See id.*

*Cho*, 2021 WL 4438186, at *9 ("Plaintiff has not alleged that the underperformance was sufficiently substantial."); *Gonzalez*, 2024 WL 6935277, at *2 (holding alleged underperformance must be "consistent" and "substantial" to plausibly state a claim).

Notably, Plaintiff misrepresents their allegations as providing "more than 6 years of MPT metrics." ECF 26 at 1, 9, and 19. Plaintiff has not provided 6 years of these metrics, or of the AC TDFs' performance returns; Plaintiff only provided data points from ***two calendar quarters***, and these data points ***change with every calendar quarter***. *Compare Genworth*, ECF 103, Case No. 3:22-cv-00532, at 25 – 35, ¶¶ 52 – 54 (showing allegations with data alleged over six years); *with* ECF 1 (showing data for two quarters). Accordingly, Plaintiff's claim that their Q4 2019 metrics are what "a prudent fiduciary would have examined in the first quarter of 2020" are simply false – what a prudent fiduciary would have examined in the first quarter of 2020 are metrics measured ***as of the first quarter of 2020***.[9]

**C.      Plaintiff's Reliance on *Daggett* and *In re Biogen* is Unavailing Because Each Case is Clearly Distinguishable.**

Plaintiff also cites to *Daggett v. Waters Corp.* and *In re Biogen, Inc. ERISA Litig.* to argue her underperformance allegations are sufficient to plausibly state a claim, but Plaintiff fails to engage with the meaningful differences between the allegations in their Complaint and the

---

[9] This also reinforces the baseless nature of Plaintiff's argument that the Exhibits to the Motion should not be considered. In essence, Plaintiff is arguing that the Court should look at performance allegations from before the relevant period, but refuse to take judicial notice of the performance of the AC TDFs from during the relevant period. Courts in this District analyzing similar claims have held that the Court may take judicial notice of documents and information that is "referenced in the complaint and central to plaintiffs' claims." *Turner v. Schneider Electric Holdings, Inc.*, 530 F. Supp. 3d 127, 132 (D. Mass. 2021); *Tracey v. MIT*, 2017 WL 4453541, at *3 – 5 (D. Mass. Aug. 31, 2017). Exhibits A and B are simply compilations of Plaintiff's allegations. Exhibit C is a publicly available document that provides important context regarding allegations at the heart of the Complaint. Exhibit D is publicly available performance information, just like the allegations at the heart of the Complaint, and only submitted to provide additional context regarding those allegations.

allegations at issue in those cases. The *Biogen* complaint relied heavily on allegations concerning the challenged funds' publicly reported strategy change, and alleged risky updates to the challenged funds; including, for example a Reuters report noting "many investors lost confidence in the Active suite 'because of [its] history of underperformance, frequent strategy changes, and rising risk'." *In re Biogen, Inc. ERISA Litig.*, 2021 WL 3116331, at \*6 (D. Mass. July 22, 2021). Indeed, the *Biogen* court specifically noted it was not explicitly relying on performance allegations to deny dismissal, holding plaintiffs' claim was not based on "irregular performance alone" (like here), but rather was "rooted in Defendants' continued investment and failure to remove the Freedom Funds following its consistent underperformance after the strategy overhaul in 2013 and 2014" (not like here). *Id.* Thus, the *Biogen* court summarized, the plaintiffs in that case not only alleged the Fidelity fund suite's underperformed, "but that it received widespread criticism – thereby alerting fiduciaries to its pitfalls[.]" *Id.*

As noted above, the *Daggett* complaint focused heavily on the exact same allegations concerning the same funds. *Daggett*, 731 F. Supp. 3d at 139-40 ("*In re Biogen* proves an instructive comparison. There, the court considered many of the same allegations of imprudence with respect to the same challenged investments at issue here…"). The *Daggett* court allowed imprudence claims to proceed because the plaintiff alleged defendants "continue[d] to retain the Active Freedom Funds" in the plan "despite arguably known risks" and "in light of the allegations of the public concerns about retaining these funds." *Id.*

Here, there are no allegations in the Complaint that the AC TDF managers deployed a risky market-timing strategy shift, or about public concerns over or "widespread criticism" of the AC TDFs. And on the contrary, publicly available information confirms that the AC TDFs are promoted to be intentionally conservative. *See* ECF 10 at 4 – 5.

**D.      Plaintiff Fails to Rebut the Persuasive Authority Concerning the AC TDFs.**

Plaintiff also fails to meaningfully respond to Defendants' cited authority that directly addressed identical claims against the AC TDFs and their alleged underperformance. Plaintiff does not explain how the allegations in *Phillips v. Cobham Advanced Elec. Sols., Inc.* decision, 2025 WL 2689268 (N.D. Cal. Sept. 19, 2025), differ from those alleged here (in fact, the *Phillips* complaint included more performance allegations concerning the AC TDFs). And, as set forth in Defendants' Memorandum, *Phillips* considered the AC TDFs performance against its Morningstar peer group median over a *ten-year* period that includes the relevant period in case, and explicitly held that from 2017 to 2023 the AC TDFs consistently outperformed their peers and were positive annualized performers for ten years. ECF 10 at 12 – 13 (citing *Phillips*, 2025 WL 2689268, at *5-6). In other words, courts assessing these exact same claims have held the AC TDFs outperformed the median and, therefore, outperformed half of the TDFs in their peer group. 2025 WL 2689268, at *5.

Plaintiff also fails to adequately address *Dawson v. Brookfield Asset Mgmt. LLC*, 2026 WL 835553 (N.D. Ohio Mar. 26, 2026). The *Dawson* court dismissed a virtually identical claim with allegations that the AC TDFs underperformed the same comparators proposed by Plaintiff by between 1% and 3% (and not exceeding 4%) over a three-year period (notably, Plaintiff's top-end underperformance number of 2.95% falls in this range). *Id.* at *15. The *Dawson* court held such allegations did not rise to the level of being substantial enough to survive dismissal, a conclusion supported by the numerous courts cited in the *Dawson* decision. *Id.* And, the *Dawson* court noted that the AC TDFs had positive returns during the alleged periods in that complaint (like here). *Id.* Plaintiff's lone statement about *Dawson* is the contention that it asserts a "bright-line" magnitude rule and conflicts with First and Sixth Circuit authority, but *Dawson* just follows the overwhelming majority of authority holding that the magnitude of performance alleged in that case (and here) is

10

insufficient to state a claim. *Id.* at *18. Specifically, the *Dawson* court considered numerous decisions from other courts about "the range of plausible imprudence" and found that allegations of 1%-3% underperformance fall below that range. *Id.*

Thus, *Phillips* and *Dawson* follow a long list of decisions holding the magnitude of Plaintiff's underperformance allegations are insufficient to plausibly state a claim. *See, e.g.*, *Abel v. CMFG Life Ins. Co.*, 2024 WL 307489, at *3 (W.D. Wis. Jan. 26, 2024) (collecting cases). Like Plaintiff, the *Abel* plaintiffs included "numerous performance charts in their complaint, which purport to show levels of underperformance during three and five-year periods by BlackRock TDFs, ranging from 0.2% to ***around 5%***, with the average underperformance being between 1 and 3%." *Id.* at *5 (emphasis added). Collecting authorities, the *Abel* court held these allegations could not survive dismissal as "district courts around the country have rejected breach of fiduciary duty claims based on similar underperformance metrics, finding alleged, short-term differences in performance of between 1.14 to 4.4% immaterial." *Id.*

Accordingly, Plaintiff fails to rebut Defendants' principal argument with any persuasive authority, and her claim should be dismissed because it fails to allege consistent and substantial underperformance for the AC TDFs.

## III. PLAINTIFF FAILS TO REBUT DEFENDANTS' ARGUMENT REGARDING THE ALLEGED COMPARATOR TDFS

Plaintiff tries to paper over her failures to plausibly allege underperformance by putting outsized importance on whether a meaningful benchmark analysis applies at this stage of the case. However, Defendants argued "the Court need not address whether the Comparator TDFs are meaningful benchmarks because the Complaint's deficient and implausible underperformance allegations warrant dismissal in the first instance." ECF 10 at 15 – 16 (citing *Bracalente v. Cisco Sys., Inc.*, 2023 WL 5184138, at *6 (N.D. Cal. Aug. 11, 2023); *see also Beldock*, 2023 WL

3058016, at *3 n.7). Plaintiff does not address *Bracalente* at all, and erroneously argues *Beldock* applies the "meaningful-benchmark standard that this District has rejected." ECF 26 at 9. That is wrong. *Beldock* determined on two separate occasions that, like here, it did not need to reach the meaningful benchmark question because that plaintiff, like this one, failed to allege sufficient underperformance to plausibly state a claim. 2023 WL 3058016, at *3 n.7 (in dismissing the amended complaint, "the court concludes that it need not consider whether Plaintiffs' proposed comparators are meaningful benchmarks against which to measure the BlackRock TDFs' performance where Plaintiffs' breach of fiduciary claim [in the amended complaint] is based solely on alleged underperformance.") (citing *Beldock v. Microsoft Corp.*, 2023 WL 1798171, at *7 (W.D. Wash. Feb. 7, 2023) (holding the same when dismissing the original complaint). So even if Plaintiff is right that this District does not evaluate benchmark suitability at the pleading stage (in the absence of First Circuit authority and in conflict with other courts to consider the question), the Court does not need to even reach the question of whether benchmark suitability is assumed because underperformance allegations like Plaintiff's are still insufficient.

Furthermore, if the Court is inclined to evaluate Plaintiff's Comparator TDFs, Defendants' argument is that the "Court is not required to go through a fact-finding exercise at this stage to assess whether Plaintiff has adequately pled the Comparator TDFs are, in fact, comparators, ***because the Complaint does not contain any allegations supporting this comparison***." ECF 10 at p. 17 (emphasis added). Defendants contend that, even if at the pleading stage it is inappropriate to analyze competing arguments about whether a plaintiff's fund comparisons are proper, here, Plaintiff failed to even allege facts that, if true, would establish the Comparator TDFs are meaningful comparisons to the AC TDFs contrary to any argument Defendants could make otherwise. *Id.* The implication of not requiring ***any*** allegations that comparators are meaningful is

that a plaintiff could benchmark an ERISA plan's TDF investment options against any other investment (like a real estate holding), plead accordingly, and the Court would have to sit on its hands and allow the claim to proceed to discovery. Such a rule does not "divide the plausible sheep from the meritless goats" for purposes of deciding what claims, if any, are allowed to proceed to discovery, *Dudenhoeffer*, 573 U.S. at 425, nor would it "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise" at the motion to dismiss stage, *Hughes*, 595 U.S. at 177.

Furthermore, Plaintiffs' reliance on their non-return metrics (flawed as they are) underscores the need to allege an apples-to-apples comparison of the AC TDFs to comparators. Plaintiff's non-return metrics are based in part on a fund's underlying volatility and specific baseline benchmark; thus, comparing these ratios across funds with divergent glidepaths and risk profiles is analytically flawed. Absent allegations establishing the Comparator TDFs are truly comparable, these shifting metrics fail to provide a meaningful basis for comparison. Furthermore, Plaintiff appears to concede that they are not trying to compare apples-to-apples, and instead alleging the AC TDFs underperformed because they did not perform as well as "industry leading TDFs" during two calendar quarters prior to the relevant period. *See* ECF 26 at 1, 3 (referring to comparator funds as "industry-leading TDF suites" and arguing "The AC TDFs significantly underperformed industry leading and investable alternative TDFs."). But courts have consistently held that "the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers." *Ruilova*, 2023 WL 2301962, at *16 (citing *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019)).

Plaintiff cites to *McGeathy v. Reinelt-Thomas Corp.*, 2026 WL 617343 (D. Ariz. Mar. 5, 2026), another AC TDF case, to argue that even if the Court applied a meaningful benchmark

standard, the Complaint should survive dismissal. But the *McGeathy* decision is short on analysis on the sufficiency of that plaintiff's underperformance allegations, and does not provide a sound roadmap for this Court to follow. *See Dawson*, 2026 WL 835553, at *18. Specifically, the *Dawson* court, analyzing similar allegations concerning the AC TDFs, noted the *McGeathy* opinion "provided no analysis as to why the underperformance was sufficiently alleged. Given the weight of authority concerning the allegations necessary to plead underperformance, the Court does not find *McGeathy* persuasive" and comparing *McGeathy* with the better-analyzed *Phillips*, 2025 WL 2689268 at *5. Accordingly, the Court should decline to follow the *McGeathy* decision's limited analysis.

In sum, the Court need not even decide if Plaintiff has sufficiently alleged a meaningful benchmark to dismiss Plaintiff's claim. However, Plaintiff's failure to plead any allegations regarding the suitability of their comparators is another reason to dismiss Plaintiff's claim.

## IV.    CONCLUSION

As set forth above and in Defendants' Motion, the Complaint fails to plausibly state claims upon which relief can be granted. Defendants respectfully ask the Court to dismiss the Complaint in its entirety, with prejudice.

14

Dated:  June 15, 2026

/s/ *Alexa Allen*

Alexa Allen, Bar No. 698378
aesposito@littler.com
LITTLER MENDELSON, P.C.
One International Place
Suite 2700
Boston, Massachusetts 02110
Telephone:     617.378.6000
Facsimile:     617.737.0052

Wesley E. Stockard*
wstockard@littler.com
LITTLER MENDELSON, P.C.
3424 Peachtree Road N.E.
Suite 1200
Atlanta, GA 30326.1127
Telephone:     404.233.0330
Facsimile:     404.233.2361

Bradley Crowell*
bcrowell@littler.com
LITTLER MENDELSON, P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202
Telephone:     303.629.6200
Facsimile:     303.629.0200

Simon J. Torres*
storres@littler.com
LITTLER MENDELSON, P.C.
815 Connecticut Avenue NW
Suite 400
Washington, DC 20006.4046
Telephone:     202.842.3400
Facsimile:     202.842.0011

*Admitted *Pro Hac Vice*

*Counsel for Defendants*

15

## <u>CERTIFICATE OF SERVICE</u>

I, Alexa Allen, hereby certify that on this 15th day of June 2026, the foregoing document was filed electronically through the ECF system and is available for viewing and downloading from the ECF system, will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first-class mail to all non-registered participants.

/s/ Alexa Allen
Alexa Allen